## Moore *versus* Small.

1. Every parol contract for the conveyance of land is within the statute of frauds and perjuries, except where there has been such part performance as cannot reasonably be compensated in damages, and where it would be unjust to rescind the same.

2. Unless *possession* be taken under the contract, there can be no pretence of part performance; but, generally, it is an act which admits of compensation.

3. Where the action of ejectment is substituted for a bill in equity to enforce the specific performance of a parol contract for the sale of land, the judge trying the cause is bound to view and weigh the alleged facts for himself. If they are insufficient to make out the case, evidence as to them should not be admitted; or, if admitted, they should not be permitted to go to the jury. If the material facts are in conflict and the credibility of witnesses be involved, the case should be submitted to the jury, but in such specific terms suited to any proper view they may take of the testimony as will leave them nothing to pass upon but the credibility of witnesses and the ascertainment of facts: and, if the judge be not convinced that the facts take the case out of the statute he should grant a new trial if the verdict be against his conviction.

4. No provision has been made in Pennsylvania, either by the Act of 10th March, 1818, or by the Act of 24th February, 1834, for the conveyance of land in pursuance of *a parol gift*. Where a person enters upon land under a promise of conveyance, and expends his labor and money in making valuable improvements which cannot reasonably be compensated by money, and becomes entitled to a decree of conveyance, it is because he is a purchaser for valuable consideration.

5. Where persons claim land under an alleged parol contract they must prove the contract; also that the land was clearly designated; that notorious and exclusive possession was taken in pursuance of the contract and maintained; and that the improvements, constituting the consideration, were made on the faith of the promised conveyance. Declarations of the owner of the legal title, though admissible in evidence to prove his alleged contract, are an unsatisfactory kind of evidence and are not entitled to much weight against his written will.

6. Where the plaintiffs claimed *the legal title* under the will of their grandfather, and the defendants claimed under a parol contract between him and their father, the burden of proof was on the defendants.

7. In an ejectment where the defendants claimed under a parol contract, but wherein, in the opinion of this Court, the evidence failed to show that they were entitled to specific performance, and there was nothing in the charge of the judge before whom the cause was tried to indicate his satisfaction with the evidence, the verdict in favor of the defendants was reversed, and a *venire de novo* awarded.

ERROR to the Common Pleas of *Lawrence county.*

This was an action of ejectment in which Nathaniel Moore and Narcissa his wife were plaintiffs, and Sarah, Eliza, and William Small, minor children of Matthew Small, by their guardian, were defendants. It was brought to recover the possession of 100 acres of land in Mahoning township, Lawrence county. Narcissa Moore was the daughter of John Small, deceased, who it is admitted originally owned the land. She claims it by devise made to her by her father, in his will, dated November 19, 1835.

The defendants are the grandchildren of John Small, deceased,

[Moore *v.* Small.]

and claim the land by descent from their father, Matthew Small. They claimed that their grandfather, John Small, made a parol gift of the land in controversy to their father, Matthew Small, which was so far performed in the lifetime of the parties as not to be affected by the statute against frauds and perjuries.

The land in controversy is part of a tract of 400 acres, originally owned by John Small. He had four sons, James, Matthew, John, and Andrew, and one daughter, Narcissa, married to Nathaniel Moore. James died in 1830, Matthew died in 1832, and John, the son, died some time previous. John Small gave to his son James, in his lifetime, the possession of 100 acres of his tract, on the north end of it. He also gave to *Matthew* privilege to build a house on the 100 acres next to the one occupied by James, and to farm it in common with himself, which he did till his death. In 1824, Matthew commenced the building of a hewed log-house, dug in search of water, and finding none, the building was abandoned, after being raised to the square, and before it was roofed. The logs were removed, and used in building a barn on a piece of land of 100 acres, which he purchased from Patrick Thompson, adjoining his father's tract on the east, on which he also built a house, and resided till his death, in 1832. After the death of James, which took place in 1830, his father sold the 100 acres, which had been occupied by him, to Nathaniel Moore. On the 10th day of November, 1835, the grandfather made his will, and devised the 100 acres next adjoining it on the south to Narcissa Moore, his daughter. No division of the tract had been made by John Small among his sons. No lines were ever run in his lifetime separating one portion of the 400 acres from another, except the north 100 acres, when it was sold to Moore after the death of James. But James had been permitted to occupy what was supposed to be 100 acres next adjoining it on the south, which is the land John Small afterwards devised to his daughter, and is the same now in controversy. It was alleged on the part of the plaintiff, that John Small continued to use the 100 acres, with the residue of the tract, by occasionally farming it, cutting and hauling away saw logs, barn logs, cord wood for his distillery, and firewood, rails, &c., during the occupancy of his son Matthew, the same as before and after. This was denied on the part of defendants.— John Small died in March, 1837.

To June term, 1847, an action of ejectment was brought by the defendants in this case against Nathaniel Moore, who had taken possession of the land in right of his wife, pursuant to the devise to her, and the possession was recovered. This action was brought to recover the possession which the plaintiffs lost in the former one. It was denied on the part of the plaintiffs that any such parol gift as was alleged, was made, and it was alleged that no exclusive possession was had of the land by Matthew Small.

[Moore *v.* Small.]

On the trial, a portion of a deposition of Eliza Love was read on the part of the defendants; a part of it relating to declarations of Andrew Small was objected to, and not read. After the examination of Andrew Small, that part of her deposition as above stated, which had not been before read, was offered for the purpose of discrediting his testimony. It was objected to, admitted, and exception was taken on the part of the plaintiffs. One objection stated to such part of the deposition was, that Andrew Small had not been interrogated as to the matters referred to in such part of the deposition of Eliza Love: 2 *Barr* 32, McAteer *v.* McMullen, cited. 2d. That the testimony of Eliza Love did not contradict Andrew Small: 1 *Peters' C. C. Rep.* 338, cited to the point, that where it is apparent that testimony, offered to contradict a witness, cannot have that effect, it is admissible.

BUFFINGTON, J., charged as follows:—

"There are a few prominent facts in this case that seem to be satisfactorily established, and not controverted. John Small was the owner of the whole tract prior to the year 1820. From the year 1823 till the time of his death, Matthew was taxed with one hundred acres; John Small with two hundred acres till 1825, and from that time till 1831 with one hundred and sixty acres, and Matthew Small with one hundred acres, part of Thompson's, for 1828. A house was built in 1824 on the land in dispute; attempts were made to dig a well, estimated altogether at $200. A second cabin was erected on the land, and a quantity of land cleared, amounting to upwards of five acres. A tenant, Samuel Stanton, resided there from the spring of 1829 to the fall of 1838. On the 19th of November, 1835, John Small made his will, devising this land to the plaintiff, and shortly afterwards died. In the spring of 1847 a suit was brought in the Court of Common Pleas of Mercer county, by the present defendants, which resulted in a verdict and judgment in their favor, in the spring of 1849.

"If John Small was the owner of the land at the time he made his will, and at the time of his death, the devise passed the land to the plaintiffs, and they are entitled to recover. The question, then, in dispute is, did the old man give the property to his son Matthew by a parol gift, which is valid in law to pass the title? The defendants so allege."

(The Court here referred to and read from the statute of frauds and perjuries.)

"To take a case out of this statute, the parol contract or gift must be proved by clear and satisfactory evidence. It need not be by a person who was present at the time the contract was made, but may be proved by the declaration of the grantor, and the circumstances attendant upon and connected with the transaction;

provided those declarations and circumstances are of such a' character as to convince satisfactorily the minds of the jury. It must be a present gift—not a promise to give in future. It must be certain in its character, and define the subject of the grant with reasonable accuracy. It is necessary that possession should be taken after the contract by the grantee, and in pursuance of it; and that possession must be exclusive in the grantee, and not in common, and mixed up with that of the grantor. But occasional entries by the grantor for temporary purposes would not create a mixed possession. It must also be followed by improvements of value made on the land. The destruction of these improvements, however, if afterwards occasioned by accident, by the providence of God, or from some satisfactory reason, would not divest the rights which had previously been vested by a valid parol sale, or gift. As if expensive buildings erected after a parol sale were destroyed by fire, lightning, or tempest, their destruction would not operate to destroy a right which had previously become valid by a fulfilment of all the requisites necessary to take the case out of the statute of frauds and perjuries.

"Such is the nature of the case which a party must make out to avoid the operation of the statute, and render valid a parol sale or gift. But such a right, being a mere equity, may be abandoned; and if so, the title and right would again return to the grantor. Whether the defendants in this case have made and proved to the satisfaction of the jury all· the requisites above mentioned, is for the determination of the jury. A failure to make out any one of them is fatal to the validity of the claim.

"Are the jury thus clearly and fully satisfied there was a gift? that the subject-matter of the gift was definitely or to a reasonable certainty described? that exclusive possession was taken after and in pursuance of the gift? that improvements of value were made on the land after the gift or contract? and that the right thus acquired was not abandoned? If so, the verdict ought to be for the defendants. But if, on the other hand, you are not satisfied from the evidence of all these requisites, then the plaintiffs, being the devisee in the will, would be entitled to recover."

To which charge of the Court the plaintiffs' counsel excepted.

Nov. 4th, 1851, verdict rendered for defendants.

It was assigned for error, 1. The Court erred in receiving the evidence contained in plaintiffs' bill of exceptions. 2. The Court erred in charging the jury that the evidence of the gift need not be by a person who was present at the time it was made; but that it may be proved by the declarations of the grantor, and the circumstances connected with and attendant upon the transaction, provided those declarations and circumstances are of such a character as to convince satisfactorily the minds of the jury. 3. The Court

erred in charging the jury that occasional entries by the grantor for temporary purposes, would not create a mixed possession.

*Stevenson*, for plaintiffs in error.

*Stewart* and *Sullivan*, for defendants.

The opinion of the Court was delivered by

WOODWARD, J.—The statute of frauds and perjuries, regarded as a rule of property, is simple and intelligible. Every mind is capable of understanding that contracts about land, if more is meant than a three years' lease, must be in writing. This rule is as apprehensible and appreciable by the common mind as those other statutory rules which make twenty-one years' adverse possession of land, title thereto; bar actions on simple contracts after six years' delay; require judgments to be revived once in five years; and liens of mechanics and material men to be entered within six months after the contract executed.

And what rule is more reasonable? Land is the most important and valuable kind of property. Or if it be not, there is no other stake for which men will play so desperately. In men and nations there is an insatiable appetite for lands, for the defence or acquisition of which money and even blood sometimes are poured out like water. The evidence of land-title ought to be as sure as human ingenuity can make it. But if left in parol, nothing is more uncertain, whilst the temptations to perjury are proportioned to the magnitude of the interest.

The infirmities of memory, the death of witnesses, the corruptibility of witnesses, the honest mistakes of witnesses, and the misunderstandings of parties, these are all elements of confusion and discord which ought to be excluded from titles to the most coveted, if not most valuable of terrestrial objects. And it is the purpose of the statute of frauds and perjuries to exclude these elements, and to compel men to create testimonials of their intentions which are certain and enduring.

Blackstone speaks of the reign of Charles II. as more polite than its predecessors, and it was distinguished by several enactments that marked an advancing civilization. The statute for prevention of frauds and perjuries was one of those enactments Though enacted before the charter to William Penn, this statute has been held not to extend to Pennsylvania. But its most material provisions were supplied to us by our Act of 21st March, 1772. It is remarkable how completely, both in England and Pennsylvania, the public mind has acquiesced in these enactments. History tells of no popular movement in either of these representative governments, for the repeal or material modification of the statute of frauds and perjuries. Chancellors and judges have

[*Moore v. Small.*]

often manifested great uneasiness under its operation, and have expounded and refined until the rule has ceased to be looked for in the statute itself, but must be tracked through volumes of jarring and contradictory decisions. The people however, whose representatives furnished the rule, have indicated their willingness that it should have free course, by never calling on their representatives to repeal it.

And yet it must be confessed, the idea, first started in England, I believe by Sir William Jones, that a statute made to suppress perjuries and frauds should be so construed as not to become an instrument of fraud, was a logical deduction. The popular acquiescence of which I have spoken may be due, in some measure, to this necessary and reasonable construction. But, that the statute should have effect except where its operation would defeat its objects, is a corollary from this principle of construction, and agreeable to reason, though lost sight of in the decision of many cases. Hard cases make bad precedents, is a maxim that has been strikingly illustrated by the course of decision under this statute. Judges have been borne away, by sympathy for parties, from the letter of the law, and in their benevolent efforts to accommodate it to the changeful circumstances of cases, copious fountains of litigation have become unsealed. Nobody has lamented this judicial amiability more than the judges themselves. For the last twenty years there has scarcely been a judge of any considerable reputation, either in England or the United States, who has not in some manner put on record his regrets, the results of large experience, that the statute had been so widely departed from, and his conviction, that more evils have resulted from such departures than they have remedied.

The best rule of construction that I have ever seen applied to the statute of frauds and perjuries, is that suggested in some of the English cases, and adopted by the Legislature of Pennsylvania in the Act of 10th March, 1818, providing for the proof and specific execution of the parol contracts of decedents, *where such contract shall have been so far in part executed as to render it unjust to rescind the same.*

This excludes the possibility of the statute becoming an instrument or occasion of fraud, for if, in any case, it is not unjust to rescind a parol contract, it cannot be fraud to rescind it. The Legislature seem to have considered all parol contracts as within the statute of frauds and perjuries, and that, though partly executed, they ought to be rescinded, if it can be done without injustice to the parties; but if they have been so far executed as to render it unjust to rescind them, then the Courts shall hold them to be without the statute, and go on and execute them fully. In passing upon the question of injustice, reference is to be had to the fact that the 4th section of the British statute, which forbids

[Moore v. Small.]

any action on a parol agreement, unless there be a note of it in writing, signed by the party to be charged, is wholly omitted in our statute. Actions for damages on parol contracts for land have been often sustained in Pennsylvania: Bell v. Andrews, 4 *Dal.* 152; Ewing v. Tees, 1 *Bin.* 450. The measure of damages in such actions is not the value of the land, for that would work an evasion of the statute, but is the price paid or services rendered: Hastings v. Eckley, 8 *Barr* 197.

The rule of construction, then, which is deducible from the Act of 1818, may be stated thus: Every parol contract is within the statute of frauds and perjuries, except where there has been such part performance as cannot be compensated in damages. This rule seems to me more reasonable than that delivery of possession under the parol contract shall be part performance to take it out of the statute, as has been asserted in many cases, English and American, and especially in Pugh v. Good, 3 *W. & Ser.* 63. Without possession taken and maintained under the contract, there can be no pretence of part performance, but generally that is an act which admits of compensation, and therefore too much is made of it when it is treated as sufficient ground for decreeing specific execution.

The rule that I have stated, though not steadily adhered to, has been recognised in many cases in this Court. See Clark v. Vankirk, 14 *Ser. & R.* 354; Eckhert v. Eckhert, 3 *Penn. Rep.* 362; Wack v. Sorber, 2 *Wharton* 253; McKee v. Phillips, 9 *Watts* 85; Lee v. Lee, 9 *Barr* 178.

Seeing that it flows from an Act of Assembly, and has received the sanction of this Court, we shall do well to stand steadily by it. But then a question arises, who is to administer it, the Court or the jury? Under the Act of 1818, or that of 1834 for the proof of contracts of decedents *in the Orphans' Court*, there can be no question that it is the business of *the Court* to administer it. Is it so then, that the equity of a *decedent's* contract is to be administered by the Court whilst that of a living man's contract is to be thrown into the jury box? The living would have a right and good reason to object to such a distinction in favor of the dead.

In everything but the form of proceeding, we are bound to deal with a parol contract for land as a chancellor would deal with it. When the proceeding is by bill, a jury has nothing to do with the facts or the equity—the chancellor determines both. To satisfy his conscience, he may, at his discretion, send issues of fact to a jury, but he is not bound to do so. Having done so, he may grant a new trial or determine the facts for himself, contrary to the verdict, but in no case can a jury have anything to do with the equity. The verdict is merely advisory, and no judgment is entered on it to which a writ of error will lie: Baker v. Williamson, 2 *Barr* 116.

[Moore *v.* Small.]

When the action of ejectment is substituted for a bill, as it is with us, the structure of the forum is changed, and the whole case is necessarily spread before the jury, who are not bound to render a special verdict. The consequence has been, the growth of an opinion among judges, that the jury must act on the whole case as it appears to their unpractised vision, and administer nice and complicated equities, to the determination of which the most cultivated judicial mind is barely equal. Twelve chancellors are substituted for one. The judge blots himself out and surrenders his functions to the jury, who, more affected by the supposed hardship of the case than by the policy of the statute, blot out, in their turn, that venerable and valuable rule of property.

But how is this to be prevented? In no otherwise than by the action of the judge as a chancellor, which he truly is. I know that here are some of the most difficult duties of the judicial office. To submit what ought to be submitted, yet in such manner as not to give the jury unrestrained license over the equities of the cause, requires care and skill on the bench. And Courts have been embarrassed in this duty by the dicta in our books that, where there is any proof of circumstances to take a case out of the statute, the value of it is to be determined by the jury. "Any proof," a "spark of evidence," and similar expressions have been used to define the powers of juries in this regard. Such dicta cannot be implicitly followed if the law of the land is to be administered.

The judge is bound to view and weigh facts for himself. If the facts relied on to make out a case for specific relief are insufficient, why admit evidence of them? Or if admitted, why suffer them to go to the jury? If the material facts are in conflict, and the credibility of witnesses is involved, the case must go to the jury, but then they should have such express directions in plain, specific, and positive terms suited to any proper view that they may take of the testimony, as will leave them nothing to pass upon but the credibility of witnesses and the ascertainment of facts. And through the power to grant new trials, the judge should superintend, with a cautious eye, the action of the jury in this their only proper sphere.

Before he suffers a solemn and beneficial statute to be set aside by a jury who have nothing to do with it, his conscience must be perfectly convinced that the facts make the case an exception to the rule: Haslett *v.* Haslett, 6 *Watts* 464; Brawdy *v.* Brawdy, 7 *Barr* 157.

A class of cases commonly called parol gifts from father to son, is found in our books, the origin of which was in Syler *v.* Eckhart, 1 *Binn.* 378, very thoroughly reviewed by Judge KENNEDY in Eckhert *v.* Eckhert, 3 *Penn. Rep.* 362. The case before us belongs to this family. Now let it be observed, that the Legislature of Pennsylvania have made no provision, either in the Act of 1818,

[Moore v. Small.]

or that of 1834, or any other Act of Assembly, for the conveyance of title in pursuance of a *parol gift of land.* Yet in most of the cases it has been the gift of the decedent that was set up to take away the inheritance of the other heirs. In this case it is a parol gift of a deceased father set up to defeat his written devise. Such a gift could not be admitted to probate under any chancery jurisdiction that has been conferred on either our Common Pleas or Orphans' Courts.

How would a chancellor treat evidence of a parol gift? He would cast it out as rubbish. There is no such thing as the execution of a gift of lands under the statute of frauds, even between father and son. Gift is indeed a common law mode of assurance, but it is a contract *executed.* Contracts, to be executed by the extraordinary powers of a chancellor, in spite of the statute of frauds, must be executory, and must be founded in a valuable consideration. It is true, the consideration may be in a prejudice to the vendee, as well as in a benefit to the vendor. And if it be said that a son, who goes upon land under a promise of a conveyance from his father, and expends his labor and money in making valuable improvements which cannot be reasonably compensated, is entitled to a decree of conveyance,.it is because he is a purchaser for a valuable consideration. It is inaccurate language to call such a contract a gift, and confusion of terms is very apt to breed confusion of ideas.

In such cases the son, like any other purchaser, must prove the contract; that the land was clearly designated; that open, notorious, and exclusive possession was taken and maintained under and in pursuance of the contract; and that the improvements which constitute the consideration were made on the faith of the promised conveyance: Woods v. Farmere, 10 *Watts* 204; Frye v. Shepler, 7 *Barr* 91; Wack v. Sorber, 2 *Wharton* 387. If the contract were ever made it must have had a time and place and terms, and it would be reasonable to expect a witness to speak of these, but declarations and confessions of the father have been so frequently received in evidence as proof of a contract, it is impossible to say they are unfit to go to the jury, but they should go, characterized by the language of Justice Rogers, in Robertson v. Robertson, 9 *Watts* 42, as the most unsatisfactory species of evidence, on account of the facility with which they may be fabricated, the impossibility of contradicting them, and the mistakes and failures of recollection. Parental declarations are often made with reference to *experimental arrangements* or *testamentary intentions* for the benefit of a son, which are sadly misapplied when brought into Court and treated as evidential of a contract of sale. The posthumous recollections of a neighborhood, as to the words of a testator, should weigh but little when set against his written will.

2 R

[Moore *v.* Small.]

In the case in hand, the plaintiffs claimed under a devise from John Small, admitted to have been the owner, in his lifetime, of the land in dispute. They stand in Court, therefore, clothed with the legal title. The defendants are children of Matthew Small, deceased, who was one of four sons of John Small, and they claim to hold the land under what is sometimes called, in the paper-book, a parol gift, and sometimes, a parol gift *or* contract between their father and grandfather. The statute of frauds and perjuries is in their way. But they claim, on the evidence, to be within the equities of the statute, and as equity considers that as done which ought to be done, the defence is, that the legal title, apparently in the plaintiffs, is really in them. The defence amounts to a bill in equity for a conveyance of that title to them, in execution of the parol contract. This is the posture of the parties, and in this position the burthen of proof is on the defendants. All the *primâ facie* presumptions are in favor of the plaintiffs. Have the defendants overcome them by such proof as we have seen can only avail to set aside the statute?

In the first place, the contract is sought to be made out by the declarations of the grandfather, but these are contradicted by the declarations of the father. The evidence represents the old man as saying that he had given the land to Matthew, and that it was his, and it represents Matthew as saying, that it had not been given to him, and that it was his father's land. However perfectly witnesses may have understood the contract, the parties do not seem to have understood it alike.

In the next place, assuming a contract, there was no sufficient designation of the land. A line was pointed out on the north, between Matthew and James, but no other line was designated by the old man, to mark off from his remaining land the 100 acres he intended for Matthew. The line claimed by Matthew on the south embraced some of the improved land of his father.

In the third place, the evidence of possession is wholly defective. That Matthew took possession of the land in pursuance of the contract, can scarcely be said to be proved, whilst it is proved that he never had the exclusive possession. There were the old hill fields on the disputed tract, spoken of by Andrew, as worked sometimes by Matthew and sometimes by the old man; and there were the saw logs, barn logs, firewood, and rails, taken from the land by the old man, to show that his possession had never been fully surrendered.

Nor, finally, were the improvements such as to raise an equity. The log house which Matthew commenced he removed to the Thompsons' tract, where he resided, and converted it into a barn. The small piece of land he cleared, if not long since paid for in the use of the improved fields, admits of compensation.

Without discussing the evidence in full, we think it failed en-

[Moore *v.* Small.]

tirely to make out these essential points. The consequence is, the defence fails. A chancellor would not decree a conveyance on such proofs. If the defendants were seeking specific execution in the Common Pleas or the Orphans' Court, they could not have it, for the "contract was not so far in part executed as to render it unjust to rescind the same." Nor is there anything in the charge of the learned judge to indicate his satisfaction with the evidence. The whole case was turned over to the jury, and they were substituted for the chancellor, to pass on the equities of the defendants, and of course they were dealt with loosely. In all this the principles I have stated were contravened, and the judgment must be reversed.

Reversed and a *venire de novo* awarded.