# FRANCIS L. HESS v. CLARK CALENDER.

## ERROR TO THE COURT OF COMMON PLEAS OF COLUMBIA COUNTY.

Argued April 10, 1888—Decided April 23, 1888.

1. In an action of ejectment involving an equitable title, it is the duty of the judge acting as a chancellor, which. he truly is, to scrutinize and weigh the evidence for himself; and, if the facts set up are sufficient in character and are clearly and satisfactorily proved, so that he is satisfied upon all the evidence that the case is a proper one for specific execution, he should so instruct the jury and direct their verdict accordingly.

2. On the other hand, if he is not so satisfied; if the facts are not sufficient, or the evidence on which they rest is not clear, satisfactory and convincing, so that his conscience is not moved to sustain the alleged contract, he should then so instruct the jury and direct their verdict accordingly: Moore v. Small, 19 Pa. 468, discussed.

3. But if the facts alleged are sufficient if satisfactorily established, yet the evidence in relation to them is conflicting, or the credibility of witnesses is involved, and the conflicting testimony is of such a character that he can conscionably sustain a verdict either way, as the jury may find, the case should go to the jury with careful instructions, to turn upon their finding of the disputed facts.

4. A parol contract for the sale of lands is void at law; and, when an appeal is made to a chancellor, whether sitting on the equity or the law side of the court, to enforce such contract, its equity must be apparent, involved in no doubt and wanting in no requisite necessary to move the conscience.

Before GORDON, C. J., PAXSON, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY and STERRETT, JJ., absent.

No. 72 January Term 1888, Sup. Ct.; court below, No. 228 September Term 1884, C. P.

On September 5, 1884, an action of ejectment was brought by Clark Calender, executor of the will of Joseph Hess, deceased, against Francis L. Hess, to recover about 138 acres of land in Jackson township. The defendant disclaimed title to about 54 acres, and set up title to the remainder, 84 acres and 124 perches, by virtue of a parol gift from his father, Joseph Hess, the plaintiff's testator.

At the trial on February 10, 1887, the undisputed facts were, that in 1871, Joseph Hess, plaintiff's testator, being the owner of the whole tract, made a written contract for the sale of it to his son, the defendant. This contract was not enforced or complied with and in November, 1876, the father divided the place into two parts, one of which was put into the possession of the defendant. Joseph Hess, the father, died in 1883, leaving a will dated November 2, 1882, duly admitted to probate, wherein he directed that his executor should dispose of the farm in Jackson township, providing for the distribution of the purchase money among his eight children by his first wife, the defendant, as one of them, to receive $300.

The defendant introduced testimony from which it was claimed that the contract of 1871 was rescinded by the parties because the land was unproductive and the defendant was unable to pay for it; that in 1876, the father, having divided the farm for the purpose, made a parol gift of the eastern or lower part of it, the land in dispute, to the defendant and assisted him in building a house upon it, contributing in various ways about $200 towards its cost; that the defendant accepted the gift, entered into possession in pursuance thereof, and erected the house at a cost of about $850; that he added a kitchen to the dwelling, dug a well, planted orchards, put up and maintained a division line which was located under his father's direction and supervision, cleared about 30 acres of new ground, fertilized and improved the land so as to make it productive, paid the taxes, had the buildings insured in his own name with the knowledge and by the direction of his father

and remained in open and notorious possession of the place as his own from the time he entered, undisturbed by any one until this ejectment was brought. There was also evidence that Joseph Hess declared at the time of the division that he was dividing the land for the defendant, and that, "Frank was to have the lower part;" that he subsequently and at various times pointed out the line to others as the line of the land he " had given to Frank."

On the part of the plaintiff, evidence was introduced in re- 'buttal from which it was claimed that in 1876, Joseph Hess made the division of the land intending to give the lower end of it to the defendant on condition that the latter would take his brother Billy, who was somewhat deranged and unmanage- able, and keep him as long as he might live, and when the division was made, the defendant refused to perform the con- dition; that defendant was then living upon the upper part of the tract in a house too small and inconvenient for his growing family, and his father desired to help him into a more comfortable dwelling, and thus assisted to build the house upon the lower part; that this house was constructed chiefly from timber on the place, and when the defendant moved into it he continued to farm the entire tract of 138 acres, as he had been doing for several years, delivering a share of the produce to his father, as a tenant from year to year. Evidence was also introduced to show that the defendant sent the carpenters to his father, saying to them that he had no right to give out the job of building, the property belonged to his father; that in 1880 defendant asked an aunt to see his father and to ask him to devise the lower end of the farm to him, and that his father replied that "Frank would know what became of the land after he was gone," and that his father demanded rents of the defendant a few days before he died, etc.

The facts more fully appear in the charge to the jury.

At the close of the testimony, the defendant requested the court to charge the jury;

1. That, if the jury believe that Joseph Hess divided the one hundred thirty-eight acres in question, and surveyed off eighty- four acres of that tract to Francis L. Hess, the defendant in this action, and that Francis L. Hess entered upon the same and erected a house thereon, assisted by his father, and improved

the place so set apart to him, pursuant to a parol gift from his father, as evidenced by the testimony of defendant's witnesses as to statements and declarations and acts of Joseph Hess; such acts are inconsistent with the continued existence of the agreement of April 8, 1871, and that contract is rescinded.[1]

2. That if the article of April 8, 1871, was rescinded by the parties thereto; and if the jury believe, from all the testimony in the case, that there was a parol gift of the eighty-four acres of land, and that the defendant pursuant to that gift entered into possession of the tract and maintained exclusive possession of same and erected thereon a dwelling and other buildings and made such improvements and expenditures of money, time and labor thereon that he cannot be compensated in damages; such parol gift became an executed gift, is valid and binding on the parties, and the will of the testator being subsequent in point of time to such gift cannot nullify it, and the verdict must be for the defendant.[2]

These points were refused, and the court, GREEN, J., 21st district, holding special term, charged the jury as follows:

Since the adjournment of court I have come to the conclusion that the proper thing to do under the circumstances would be to direct a verdict. I feel very well satisfied that there is so much doubt in the case as would prevent a chancellor from making a decree of specific performance; doubt, particularly, with regard to the agreement and to the taking possession under the agreement, such as to compel a ruling, deciding the cause. We therefore say to the jury that the court, naturally averse to taking from them the determination of the cause after they have carefully listened for two days to a great number of witnesses, yet feels compelled by a sense of duty under the authority of the Supreme Court to direct a verdict in this case.

The evidence to sustain a parol gift of land—the claim here— must be clear, positive, indubitable, conclusive. The question arises whether the evidence here is of that character which shows beyond a doubt that there was a gift of this land by the father to the son. To validate such gift, possession must have been taken by the donee in pursuance of the gift, and he must have made substantial improvements upon the land such as cannot readily be compensated in damages. The policy of

the law requires that the muniments of title should be in a form not liable to mistake ; that a conveyance of real estate should ordinarily be in writing ; for a parol gift is in its nature uncertain and vague, resting in the memory of individuals, whose recollection may be uncertain or unreliable, whereas a writing always speaks for itself and speaks for all time. It contains within itself the description of the premises conveyed, the consideration that may have been paid, the names of the parties, and every essential of the contract; but a contract by word of mouth, alone, is necessarily liable to the defects which may be caused by failure of human recollection or to the distortion due to the wilful or the unconscious perversion of fact by human testimony, and therefore the law requires that a transfer of property in land shall be in writing or else shall be shown by clear and indubitable proof.

If we had only to consider the testimony on behalf of the defendant, Francis L. Hess, we think it might properly be submitted to the jury to determine the question of fact whether this alleged parol gift had been made out; but all the evidence in the cause, taken together, raises, I think, too much doubt to suffer us to say by its submission to the jury that it satisfies the requirement of the law, already mentioned, in regard to clearness and positiveness.

In 1871 there was an article of agreement for the sale of this land from the father to the son. If this agreement was changed at all, it was not till 1876, or within a year or two subsequently to that time. The surveyor, Dewitt, testifies that he was called by Joseph Hess in 1876 to run a division line between what have been called here the upper and lower tracts, and that Joseph said to him at that time, that he intended the lower tract for Frank, or Francis, the defendant; and that, at Joseph's direction, he made out in Frank's name the draft for this lower tract. That draft is not produced, but the witness produces a draft which he swears is a copy, and that he made out the original in Frank's name, as directed by Joseph. This is strong testimony to show an intention on the part of Joseph Hess at that time to give this land to his son Frank ; but if the intention is not carried into action it amounts to nothing ; if it were true that he really did intend to give this tract of land to his son Frank, but if he did not in fact give it to him, then his

intention would not be sufficient to establish the claim of a parol gift. Knouse testifies that he helped to run this division line, and that on the evening of the same day on which the division line was run he heard a conversation between Joseph and Frank, in which Joseph said to Frank that he would give him the lower half or part, if Frank would take care of his infirm brother Billy—as the father called him—for the remainder of Billy's natural life, which offer Frank refused, and that then the father offered the son the whole tract upon the same condition, which offer was also refused by Frank. If this testimony is believed, then the fact that a division line was run that day would amount to very little. You have also the testimony of Knouse as to what took place a few months after the death of Billy, which death occurred some eight or nine months after the division line was run. I think he said that he had a conversation with Frank, in which Knouse said to Frank that if Frank had agreed with his father to take Billy he would now have had this land, and that Frank assented to that, said he was sorry that he had not accepted the proposal, but that he had refused on account of his wife's unwillingness; something to that effect. If Frank had before this time received an absolute gift of this land, his natural reply would have been that it made no difference, that the land had been given to him anyhow, or some words to that effect. This testimony it seems to me, raises a doubt as to whether the division line was run for the purpose of giving to Frank absolutely and unconditionally the lower portion of this farm, or simply for the purpose of making an arrangement to give it to him provided he would take Billy—such a doubt as throws a cloud over the clearness and positiveness of the testimony.

Knouse left at about eight o'clock in the evening, while Joseph and Frank were still engaged in conversation; he could not know what further was said between them; but there is no evidence that anything further was said, or that any understanding or arrangement was arrived at, and the testimony of Knouse as to what occurred afterwards between himself and Frank would tend to the inference that no agreement was completed at that interview between Joseph and Frank.

The building on the lower tract, the house, was not erected, as I understand the testimony, until 1878; finished in 1879.

It is essential to the validity of a parol gift that possession should have been taken thereunder, but a party already in possession by prior arrangement cannot take possession under the gift. If the evidence here showed that the division line was run for the purpose of dividing the farm in order to give Frank the lower part, and that then this house had been built in furtherance of that design and that Frank had gone into possession in pursuance of the same design, that would have been all that the statute requires, so far as possession is concerned. Was this house built with the understanding that Frank should become the owner, unconditionally, of the lower portion of the farm? The new house was erected while Frank lived in the old house upon the upper lot, and he then moved into the new house; but we are not informed of what took place between the time of the survey in 1876 and the time of the completion of the new building in 1879. The question arises, whether the defendant took possession of this house in pursuance of a parol gift previously made and completed, or simply because, the upper house being small, his father had helped him to build a larger and more convenient one on the lower tract. There is no direct testimony here to show that Frank moved from the upper to the lower house in pursuance of a parol gift. Unless the jury would be warranted in coming to the conclusion that such gift had been made, no inference could be drawn from the mere change of possession from the old to the new house. You have the declarations of Joseph Hess that he intended to build this house for Frank because the old house was too small. If the father's purpose was simply to provide Frank with a more convenient dwelling because the old house was not large enough, and not because Frank had become absolute owner of the land on which it was erected, then Frank's taking possession of it was not under a parol gift of the land, and it would be necessary for the jury, if the case were submitted to them, to find what this possession was; whether in pursuance of a parol gift or not, a question involved, it seems to us, in considerable doubt.

The testimony as to the conduct of the defendant at the time he supposed his father was drawing up his will, throws some doubt upon the theory of a parol gift: his sending his aunt Lavina Boyer to intercede with his father to have him

give Frank the lower farm in his will. Whether that testimony is explained by the fact that the defendant had no deed for this farm and simply wished a writing of some sort to show that he actually held the legal title, or whether it was an attempt to persuade his father to give him then a legal title to property which the son was conscious that he did not own, is a question of such grave doubt as to cast a shadow or a cloud upon the clearness of this testimony as to a parol gift, particularly since Lavina Boyer says nothing of any claim by the defendant, at the time of the application through her to his father, that Frank wished only to be assured in his title or that he already owned the land. On the other hand, the father then undertook to dispose of this very tract by will, showing that he did not at that time recognize Frank's ownership. Judge Krickbaum who took notes of his intended will, says that Joseph then recognized Frank's claim to the farm in question under the article of agreement made in 1871, and that there was some talk between them in regard to that.

At the time the house was building, a witness who asked Frank if he had authority to contract with him for its completion testifies that Frank said no, it belonged to his father, he must go to him; another witness testifies that the timber cut from this land to build this house was to be returned in some way; two others testify to a demand upon Frank for rent and to his paying a portion of the rent in grain, there being at that time only one barn upon the whole tract, the crops undivided, thus leaving in doubt whether the produce demanded by Joseph and furnished by Frank was from the lower or from the upper tract; if partly or entirely from the lower tract, then its delivery in compliance with a demand for rent would be an act inconsistent with the claim of absolute ownership of the fee.

At the time of the reading of the will, the testimony shows that Frank was angry and disappointed, as well as some of the other heirs, at the way he had been treated in the will; and that he made no claim at that time that the land was his by previous gift from his father. The will gave this farm into the hands of the executor, with power to sell at either public or private sale, and directed how the proceeds of that sale should be divided. These are all facts that are undisputed.

Arguments.

The defendant swears that at the time of the appraisement he was willing to give to the appraisers a list of the property that was on the lower farm, but was not willing to be called to account for it. This testimony is uncorroborated by that of Klinger or that of the appraiser or that of the executor, though Klinger says that he was present, as the others also were. The relevancy of this fact is that the defendant's act is inconsistent with the claim of ownership, and so serves to cast a cloud upon the testimony in favor of that claim.

The evidence as to the attempt of the defendant to induce Klinger to join with him in the purchase of this lower tract is, of course, in contravention of the idea that the defendant then believed the land to be his own.

As to his alleged negotiations with a view to buying the favor of the executor, they might have to be considered by the jury if the case were left to them ; but we have given to that part of the testimony no weight in arriving at our conclusion that the proof of the affirmative—which burden the law lays upon the claimant—that this land was given by parol to this defendant, is not made out with sufficient clearness to justify the court in submitting the evidence of it to the jury, and that therefore we must direct a verdict for the plaintiff.[1]

The jury returned a verdict in favor of the plaintiff for the land described in the writ, except the portion as to which the disclaimer was filed. A motion for a new trial was refused and judgment entered upon the verdict, when the defendant took this writ assigning as error:

1. The withdrawal of the case from the jury with binding instructions to find for the plaintiff.[1]

2, 3. The refusal of defendant's points.[2] [3]

*Mr. James Scarlet* (with him *Mr. L. E. Waller*), for the plaintiff in error :

This is one of the family of cases, in the language of Moore v. Small, 19 Pa. 468, " commonly called parol gifts."

1. The burden of making out the parol gift undoubtedly was on the defendant. Did the defendant overcome the prima facie presumptions in favor of the plaintiff ? The court below said : " If we had only to consider the testimony on behalf of

Arguments.

the defendant, we think it might properly be submitted to the jury to determine the question of fact whether this alleged parol gift had been made out." What was it, then, that made the defendant's case doubtful? Nothing but the credibility of witnesses or the conflict of material facts. This being so, we were clearly within the ruling of Moore v. Small, supra: "If the material facts are in conflict and the credibility of witnesses is involved, the case must go to the jury; but then they should have such express directions in plain, specific and positive terms, suited to any proper view that they may take of the testimony, as will leave them nothing to pass upon but the credibility of witnesses and the ascertainment of facts." Questions of fact are for the jury; they alone can pass upon the credibility of witnesses: Curry v. Curry, 114 Pa. 371; Bank v. Donaldson, 6 Pa. 179.

2. This court said in Curry v. Curry, 114 Pa. 367: "In an equitable ejectment, the judge acts as a chancellor, and if he is not moved as a chancellor to grant the equitable relief sought, he may withdraw the case from the jury." This does not mean that he may take controverted facts from the jury. He may withdraw the case from the jury when the party on whom the burden of proof lies has himself developed a hindrance to his recovery, has failed to prove a material fact, or has shown by his own evidence that he is not entitled to recover, precisely as though a plaintiff in an action of negligence had shown contributory negligence. The principle is, that the party must have a doubtful case from his own showing; his case cannot be made doubtful, within the rule, by the mere denial of his opponent's case. If the facts are denied, the province of the jury attaches, and if there is any question of fact for the jury, a verdict cannot be directed: Wilde v. Trainor, 59 Pa. 439; 1 Taylor on Ev., 85. In the present case, if the defendant's witnesses were to be believed, in the opinion of the court he had made out his case. But, because the plaintiff denied that case, a doubt was raised. In such a case, who was to decide? The jury.

3. We accept the rule as settled, that, as between father and child, the evidence of a gift or sale must be direct, positive, express and unambiguous; that its terms must be clearly defined and all the acts necessary to its validity must have

special reference to it and nothing else : Shelhammer v. Ash-
baugh, 83 Pa. 24 ; E. & W. V. R. Co. v. Knowles, 117 Pa. 77 ;
Moore v. Small, 19 Pa. 468 ; Poorman v. Kilgore, 26 Pa. 365 ;
Sower v. Weaver, 78 Pa. 443 ; Hart v. Carroll, 85 Pa. 510 ; Al-
lison v. Burns, 107 Pa. 50.   If defendant's witnesses were to
be believed, the evidence fulfilled all the requirements of the
rule and proved a contract executed.

4. The expression that the parties must be brought face to
face, used in Ackerman v. Fisher, 57 Pa. 457, and cited in
Allison v. Burns, 107 Pa. 50, is interpreted in Taylor v. Hen-
derson, 38 Pa. 62, by justice THOMPSON, who says : " Here
there was neither proof of a contract between the parties face
to face, nor such an execution of it as could be referable to
that mode of transfer ; " clearly implying that the requisite of
bringing the parties face to face might be inferred from the
execution of the gift or the circumstances directly pointing to
it.   In the strongest of cases, if the witnesses present should
die, the contract or gift could not be proven except from the
manner of its execution.   As said in Sower v. Weaver, 84 Pa.
267, the question is generally one of execution.   But in the
present case, the parties are brought face to face and all the
requirements fulfilled.

*Mr. E. R. Ikeler* (with him *Mr. Grant Herring*), for the
defendant in error :

" This is another of that illegitimate and suspected brood
that is continually being hatched out of the exceptions to the
statute of frauds, and giving rise and permanence to family
feuds : " LOWRIE, J., in Cox v. Cox, 26 Pa. 381.

1. The sentence quoted from Moore v. Small, 19 Pa. 469,
must not be construed alone.   Construed in connection with
the context, it is not only in harmony with the remaining part
of the opinion, but must inevitably lead in this case to the re-
sult attained in that.   Under this construction of the whole
opinion, it is the plain duty of the court in this class of cases :
(1) To sit as a chancellor.   (2) To " superintend the tes-
timony with a cautious eye."   (3) To first convince his con-
science that the facts make the case an exception to the rule.
(4) When he has come to such a conclusion, if the material
facts are in dispute, to submit the case to the jury under the

clearest instructions. There is no such thing as the execution of a gift of lands under the statute of frauds, even between father and son. What is commonly known as a parol gift of land is in reality an executory contract sought to be executed by the extraordinary powers of a chancellor : Moore v. Small, 19 Pa. 468 ; Eckert v. Mace, 3 P. & W. 364.

2. The trial judge, sitting as a chancellor, is bound to consider the whole case before submitting it to a jury. As the burden of proof throughout is on the defendant, if on the whole case it is left doubtful where the truth lies, the verdict must be for the plaintiff. The case must be proved to the entire satisfaction, not only of the jury, but of the chancellor also : Haslet v. Haslet, 6 W. 465 ; Brawdy v. Brawdy, 7 Pa. 159 ; Edwards v. Morgan, 100 Pa. 335 ; E. & W. V. R. Co. v. Knowles, 117 Pa. 77 ; Sower v. Weaver, 78 Pa. 448 ; Curry v. Curry, 114 Pa. 367.

3. A contract is not to be inferred from the declarations of one of the parties, especially when that one is the father. "It is every day's occurrence that a father speaks of having given a lot of ground to a son, when it is plain there was no intention to transfer the ownership. Were courts to look at the language of parents expressed to others, as evidence of title in children, it would annihilate domestic confidence, and, doubtless in most cases, would be giving an effect to loose declarations that never was intended : " Ackerman v. Fisher, 57 Pa. 459. Of the defendant's assent to any bargain, gift, or otherwise, not a word is proved ; and in the very nature of these family transactions, improvements are not evidence of a gift of the land : Cox v. Cox, 26 Pa. 383.

*Mr. Scarlet*, in reply :

1. We submit that it is competent for the court to say that a material fact is not supported by proof ; that is, that there is no proof of the designation of land by boundaries, or no evidence of occupation, or of improvements. But where there is evidence which can prove all these facts, the jury must say whether or not they exist : 1 Taylor on Ev., 35 ; Cambria Iron Co. v. Tomb, 48 Pa. 387 ; Myers v. Hart, 10 W. 104 ; Taylor v. Preston, 79 Pa. 436 ; Barnes v. Sutherland, 7 Pa. 103. The test of the defendant's right to go to the jury is, if the verdict

was against the plaintiff, whether the court must set it aside as contrary to or against the weight of the evidence : Hyatt v. Johnston, 91 Pa. 196.

OPINION, MR. JUSTICE WILLIAMS :

In the case of Reno v. Moss an opinion is this day filed in which we have considered the powers and duties of a judge in the trial of an equitable ejectment: [reported ante, 49.] In the case at bar we are to consider the province of the jury in the same form of action.

The defendant below, now plaintiff in error, defended under a parol contract. He alleged that his father, under whose will the plaintiff claimed, had given the land in controversy to him several years before his death ; that he had taken possession under the gift, continued in possession uninterruptedly and made valuable improvements. The·learned judge who presided at the trial regarded himself as a chancellor from whom a decree for specific performance was asked, and not being persuaded that the proof was sufficiently clear, positive, and convincing to justify a decree, refused to submit it to the jury. This the plaintiff in error insists was wrong, and contends that in Pennsylvania it is the duty of a judge in an equitable ejectment to send a case to the jury "whenever material facts are in conflict or the credibility of witnesses is involved." Moore v. Small, 19 Pa. 468, is relied on as establishing this doctrine.

In that case the plaintiff claimed title under the will of John Small. The defendants set up a parol contract which they alleged had been made between John Small, who was their grandfather, and Matthew Small, their father. There was a distinct denial by the plaintiff that the alleged contract had been made or possession taken under it. Every material fact asserted by the defendants in support of the parol contract was controverted, and if the rule which it is insisted this case lays down could be applicable anywhere this was a case for its application. The learned ·judge of the court below was of that opinion and submitted the whole case to the jury. He said : " Are the jury clearly satisfied there was a gift ? That the subject of the gift was definitely or to a reasonable certainty described ? That exclusive possession was taken after ·

and in pursuance of the gift? That improvements of value were made on the land after the gift or contract? and that the right thus acquired was not abandoned? If so, the verdict ought to be for the defendants."

The jury were satisfied upon all the points suggested by the learned judge and rendered a verdict in favor of the defendants. The case came into this court and was promptly reversed, because it had been given to the jury upon evidence that was insufficient in the opinion of this court to support a verdict in favor of the defendants. "The whole case," said Judge WOODWARD, who delivered the opinion of the court, "was turned over to the jury and they were substituted for the chancellor to pass on the equities of the defendants, and of course they were dealt with loosely." In discussing the relation between the judge and the jury in this class of cases, he stated the rule thus : "In everything but the form of the proceeding we are bound to deal with a parol contract for land as a chancellor would deal with it. When the proceeding is by bill, a jury has nothing to do with the facts or the equity; the chancellor determines both. To satisfy his conscience he may at his discretion send issues of fact to a jury, but he is not bound to do so. Having done so he may grant a new trial, or determine the facts for himself contrary to the verdict, but in no case have the jury anything to do with the equity." Turning then from a proceeding by bill to an action of ejectment involving an equitable title, he refers to the tendency to overlook the rule in equity and submit the equities to a jury, and to the manner in which the statute of frauds is thus blotted out by a verdict, and asks : " But how is this to be prevented ? " and proceeds at once to answer the question : " In no other way than by the action of the judge as a chancellor which he truly is."

The duty of a chancellor is not in doubt. He must scrutinize and weigh the evidence for himself. If the facts set up are sufficient in character, and are clearly and satisfactorily proved so that he is persuaded that in equity and good conscience a decree should be made, he will enforce the contract. But specific execution is not of right but of grace. If one has a legal right on which he can rest his title to relief, a court of law is his proper forum. It is because he has no right at

law to the relief he seeks that he comes into a court of equity. He must come with clean hands; his application must be made with reasonable promptness; it must be conscionable; it must rest upon facts that are made to appear by proofs that are clear, satisfactory in character, and convincing. If such a case is not presented, it is an unwarrantable abandonment of duty for a judge to turn the case over to a jury, and do by means of their verdict what as a chancellor he would refuse to do.

What then is the province of the jury in such a case, and what is the meaning of the expression quoted by the plaintiff in error from the opinion in Moore v. Small? We reply that it is simply that of an advisory council in aid of the conscience of the chancellor: Moore v. Small, supra; Brightly Eq., §§ 758–59; Piersol v. Neill, 63 Pa. 420. If he is satisfied upon all the evidence that the case is a proper one for specific execution, he should say so to the jury and direct their verdict. If he is not satisfied; if the facts are not sufficient or the evidence on which they rest is not clear, satisfactory, and convincing, so that his conscience is not moved, he should in like manner say so to the jury and direct their verdict. If the facts alleged are sufficient, if satisfactorily established, but the evidence in relation to them is conflicting or the credibility of a witness is involved, and the conflicting testimony is of such a character that he can conscionably sustain a verdict either way according as the jury may find, the case should go to a jury with careful instructions, so that it may turn upon their finding of the disputed fact. On the other hand, if the evidence in support of the witness or fact necessary to sustain the parol contract is suspicious or unreliable in character, so that the chancellor could not conscionably sustain a verdict resting upon it, he should not submit it to the jury. Their finding is in aid of his conscience, and when upon all the evidence he could not in good conscience accept their verdict as a fair and just disposition of the question, whatever the verdict might be, he may dispose of the case without their aid.

It may be said that this leaves a very narrow field for the jury, and so it does; but it is as broad as the nature of the controversy admits of without stripping the chancellor of his authority and delivering his conscience into the keeping of a jury. This we are not prepared to do. A parol contract for

the sale of lands is void at law. The statute of frauds and perjuries so declares in the plainest and most explicit manner. Its provisions rest on settled principles of public policy. Whether wisely or not, courts of equity have undertaken to grant relief in certain cases against the plain provisions of the statute. When an appeal is made to a chancellor, whether sitting on the equity or the law side of the court, to enforce a contract void at law, its equity must be apparent, involved in no doubt, and wanting in no requisite necessary to move the conscience. This is to be judged of by the chancellor, the jury in proper cases acting as an advisory council.

The judgment in this case is affirmed.